The opinion of the Court was delivered by
Inglis, A. J.
These are actions of debt on bond brought in the Court of Common Pleas for Beaufort District, wherein declarations were filed on the 12th August, 1861, and, for default of appearance, judgments were ordered on the same day. Owing to the hostile occupation of that section of the State, and the military events which followed, there had been no sitting of the Court since the date of that order until the recent Fall Term. A motion.was then made for an order that “ the Clerk do sign final judgment and issue execution,” which was refused in deference to the supposed requirement of the Act of Assembly entitled “An Act to alter and fix the times *149 for holding the Courts of Common Pleas in this State,” ratified on the 21st day of September last. And the present appeal, affirming that this “Act is, by the Constitutions of this State and the United States, void,” and consequently inoperative to deprive the plaintiff of his otherwise admitted right to have judgment and execution, renews the motion therefor here. The particular provisions of the Act, which have been brought under review in the argument of this and the other cases arising under it which have been heard at the present sittings, are contained in the first three sections, to wit:
1. “ From and after the ratification of this Act, the Judges of the Superior Courts of Law in this State shall hold the first and next sitting of the Court of Common Pleas, for the trial of civil cases arising ex contractu in the several circuits now established by law iu this State, in the ensuing spring, at the times and places in each district already established by law.”
2. “All writs and other process of the said Courts, mesne and final, now made returnable to the Fall Terms heretofore established, except mesne process in cases of tort, shall be returnable to the Spring Terms of the Court, in the year of our Lord one thousand eight hundred and sixty-seven, the same as if already so .directed; and the same rules of imparlance, and the same order of proceedings now existing, shall apply to the Courts established by the first section of this Act.”
3. “All writs in cases of tort shall be returnable, as heretofore provided by law, to the regular terms of the Courts as now established; and it shall be the duty of the Clerks of the Courts of Common Pleas to prepare dockets of all cases of tort, for the regular terms of their respective Courts.”
There have been assigned in argument several particulars wherein this statute is, it is supposed, repugnant to the Constitution of the State, but the Court has not thought it necessary, in its judgment, t5 advert to more than one of these. If the Act “impairs.the obligation of contracts,” to whatever *150 extent it does so it is without legal validity, for such legislation is forbidden as well by the Constitution of the United States as by that of the State.
When this State assented to the Constitution of the United States, she declared that Constitution to be the supreme law within her own limits, and required her Courts, whenever in proceedings before them its provisions should be drawn in question, to conform their judgments to those provisions, “ any thing in the Constitution and laws of the State to the contrary notwithstanding.” The prohibition of any legislation which “impairs the obligation of contracts” is, therefore, when occurring in the Federal as well as in the State Constitution, one of those restraints to which- the people of the State have voluntarily subjected themselves, and not one imposed on them by either the legislative or judicial department of their government. Such restraints, it is presumed, were assented to in the fundamental law, because they were believed to be, in the general result, most conducive to the true interests of the whole people as a political community; they constitute the ortly peaceful security of the minority — of the weaker and less self-asserting interests — against the violence of those social convulsions occasionally generated by the action of political or commercial forces, which for a time confound the perceptions of right and wrong, and by tbe urgency of instant pressure tempt the majority to the adoption of unwise and unjust measures of relief; they form the ultimate basis on which reposes the confidence that is itself the support of all credit, and the security of the whole fabric of social prosperity. Their value and efficiency for these ends depend, of course, upon the fidelity with which they are observed by the General Assembly, or the constancy with which they are enforced by the Courts. But whatever may have been the grounds and reasons for their introduction into the Constitution, so long as they continue to be there, they are expressions of the sovereign will in the most solemn form such expression ever puts on, and every *151 one engaged in the administration of the Government is under the highest possible obligation to maintain them. If the General Assembly, through inadvertence or mistake, clothes in the forms of law, rules of property, conduct or procedure, which contravene these prohibitions or any of them, such rules cannot be and are not law, and when, in any case properly here for adjudication, the judgment of this Court is well convinced of the repugnance, it dare not do otherwise than so declare. The single office of the Court is to administer justice, of which the law is the only standard, and when two propositions, each wearing the forms of law, but of different rank, conflict, that which is supreme in rank is alone the law and must be administered by the Court. Any other course would imply.an utter disregard of the obligations of duty and the sanction of an oath, would spread consternation and alarm throughout society, and justly provoke the scorn and' detestation of every honest man. Nor should it be forgotten that when the restraint upon State legislation which is broken through in the particular instance is an article of the federal as well as of the'social compact, the judgment of the State Court, if sympathy with the troubles which thus seek relief, or other less worthy motive, could mould it into conformity with the' State legislation, is liable to be reviewed by another tribunal whose special office it is, authoritatively for all Courts, to expound the provisions of the Federal Constitution.
In order to ascertain whether the particular statute now brought under consideration is obnoxious to constitutional prohibition, as “ impairing the obligation of contracts,” it is necessary to look beyond the end proposed in its title, to the effects accomplished by its provisions, and to inquire whether these effects, if apparently liable to the objection, are direct and primary, so that when they are completed the statutory provision is functus officio, or are merely incidental and subordinate to some general and enduring change in the organization of the judicial system or the course of - legal procedure *152 from which they cannot be separated. From the earliest period of which any. records are accessible, there have existed in South Carolina two distinct Courts of law of general jurisdiction within their respective spheres — a Court of General Sessions, having cognizance of all pleas criminal, and a Court of Common Pleas, having cognizance of all civil pleas or actions. At all periods the same Judges that sat in the one Court sat also in the other, as is now the case, their commissions embracing both jurisdictions alike; but while the sittings were confined to Charleston, and for some time afterwards so far as'respects the Courts of that city, the terms were wholly distinct. Since the first establishment of Circuit Courts in the interior, two terms of such Courts have been required to be held every year, at each of which pleas, criminal and civil, are to be entertained indifferently. The arrangement of the districts into circuits, and the assignment of the "particular days for each term in the several districts, have been frequently changed in whole or in part. But, throughout, the two terms have remained, and the jurisdiction of each of the two. Courts has continued unchanged. The one Court of Common Pleas now, as at the beginning, has cognizance of all civil pleas or actions, embracing equally those which arise ex delicto and those which arise ex contractu. The present statute, although entitled “An Act to alter and fix the times for holding the Court of Common Pleas in this State,” has wrought no change in any of these- particulars. No new Court is in fact established ; no distinct Court to be thereafter held for the trial exclusively of actions arising ex contractu is really created by it. The days previously assigned by law for holding the Courts of Common Pleas are not changed, either permanently or temporarily, generally throughout the State, or especially in any particular districts. The one Court of Common Pleas remains as heretofore, with its jurisdiction unchanged, and “the times for holding it” in nowise “altered.” This continuance of the previously-existing system is expressly con *153 templated by the Act in its third section, so far as it relates to the cognizance of civil pleas or actions arising ex delicto. The Court itself, then, continues, and it sits at the same times and places as heretofore, but a portion of its jurisdiction is suspended until the Spring Term in the following year. Until that time it may not proceed in “ the trial of civil cases arising ex contractu,” which are pending before it, nor receive the “ returns of writs and other process” in actions of this class which have issued from it. All the proceedings of the Court, according to its usual and still unchanged general rules of practice, in actions which have been instituted therein for enforcing the performance 'of contracts, are arrested by this statute, and made to stand still for the period of six months, while all its other operations meantime move on undisturbed as heretofore. It seems impossible not to see that this is the effect of the first three sections of this Act, with which alone the Court has now to do. And this effect is not an incidental and subordinate result from a general and permanent change wrought in the system of judicature or the course of legal proceedings, operating indifferently on all classes of suitors and without limit of time. On the contrary it spends itself upon the particular class of actions the causes of which are alone within the protection of the constitutional prohibition; it stays the enforcement of existing contracts only. And this is the direct and not only principal but entire operation of the Act; there is no more beyond. When this immediate effect has been accomplished, the whole office of the statute has been fulfilled, and all things pertaining to the subject-matter return to precisely the same condition and course which existed prior to its enactment. It is a special suspension, for the limited period designated, of the prosecution, which under the general rules of procedure might otherwise go on, of all suits pending or to be now brought to compel the performance of contracts, and it is no more. May the General Assembly thus directly interfere with the creditor *154 while he is actually obliging his debtor to fulfil his contract by the means which the law gave him for that purpose when the contract was entered into, and thus “ delay, hinder, and defeat” him for six months in the progress of his proceeding ? Does not such legislation “impair the obligation of contracts?”
The “obligation of contracts,” it is said, is not affected by this statute; it acts only on the remedy or method of enforcing the obligation, which the law had provided, leaving the obligation itself untouched. It cannot be necessary, and would scarcely be becoming, so soon to renew here the discussion at large, as to what constitutes “ the obligation of contracts,” and how this obligation may, by legislation, be “ impaired.” A brief and rapid exposition of individual views will, perhaps, be indulged. The word “ obligation” in its origin imports compulsion — the tying or binding one against or irrespective of his consent. But consent is of the essence of a contract; the presence of compulsion on either side is fatal to its existence. The contract, therefore, or act of contracting, does not create an obligation, does not itself put any force upon the contracting party, since, by the very nature of the transaction, he voluntarily undertakes to do the thing promised. And when his mind afterwards changes, and his consent or willingness to do the thing contracted no longer exists, the contract possesses no innate self-executing efficiency. It has within itself no force by which it can constrain his recalcitrant will. The obligation — that which, by a force stronger than his dissenting inclination or his repelling interest, constrains his will or ties him to the performance of his promise, whether he continue willing or not, and but for which he would, in many instances, refuse such performance — is the creature exclusively of law. The contract is the occasion, but it is not the efficient cause of obligation. When the promise has been made, if the law commands its performance and makes *155 the command effectual by methods of 'actual compulsion, it is the combination of these — the command and the constraining force — which constitute the obligation of the contract — the compulsory efficiency which the law annexes to it. The requirement of the law may or may not be, in all particulars and inflexibly, commensurate with the terms of the contract, and the methods of compulsion may or may not be fully adequate to insure complete fulfilment of that requirement; but whatever may be the extent of these, that extent and nothing else is the exact measure of the obligation. Where there is no law there is no obligation, and if it were possible for the human race or any portion of it to exist in society without-law- of any kind, there might be a condition in which there would be no obligation of individuals to keep their “words of promise” to each other. Whether they would fulfil them against their present inclination or interest would, at last, depend wholly on tbe accident of comparative individual power, — the same force which extorts the purse of the traveller. at the demand of the highwayman. There is but one universal law, because there is but one universal law-giver, and the requirements of that law, with the sanctions by which they are enforced, constitute moral obligations. But the Constitution is not dealing with obligations of this kind, for human legislation cannot impair or otherwise affect these, nor-does it attempt to enforce them merely as such. It is manifestly the legal obligation of contracts which State legislation, is forbidden to impair, for only this is within its reach. And this obligation, its extent and power, must necessarily be-created and measured only by the law of the particular State: The “ obligation of contracts,” as an abstract legal entity, in-this State, as in every other State, at any particular time; must depend upon and be ascertained by the then existing laws of the State. There is and can be no general or universal legal obligation, for there is no universal or general-human law-giver, and therefore no universal or general law *156 of this kind to create or measure obligation. The same proposition, as a wise rule of conduct, property or procedure, may commend itself to the acceptance of several and even perhaps of all civilized States, as calculated everywhere to promote the ends for which government and law exist, but it has the authority and actual force of law in each, only because so ordered by the sovereign authority of that particular State.
It is not, however, the mere command of the s'overeign authority, separate from the actual compulsion whereby compliance therewith is secured, which constitutes the entire legal obligation of contracts. Such command does indeed create the civil duty, and define its extent; but duty and obligation, though the terms, in one of the senses of the latter, are often used interchangeably, are not the same thing. “Obligation,” says Lord Ooke, “ is a word of large extent,” and, although it sometimes means only duty, and always includes this meaning, it here imports more besides. “ It is but lost labor to say,' do this or avoid- that,’ unless we also declare, ' this shall be the consequence of your non-compliance.’ The main strength and force of a law consists in the penalty annexed to it. Herein is to be found the principal obligation of human laws. Legislators and their laws are said to compel and oblige,’ “because, by declaring and exhibiting a penalty against offenders, they bring it to pass that no man can easily choose to transgress the law, since, by reason of the impending correction, compliance is, in a high degree, preferable to disobedience.” 1 Bl. Com. 57. The same course of remark is equally applicable to the enforcement of civil duties between individuals. If the law contented itself with declarations of civil right and wrong, and directions to do the one and abstain from the other, how much constraining power would it exert over the wills of its subjects? how far would it oblige them to the conduct which it approved ? The mere favor or displeasure of an earthly sovereign has but little motive power against inclination or *157 interest. What actual obligation is there in law to perform one’s contract, if the law provides no means of compelling the performance or reparation of the damage resulting from non-performance ? And when such compulsion is withdrawn, the legal obligation ceases to exist. Why is it that, at the expiration of four years after the right of action has accrued upon an unsealed contract, the legal obligation theretofore existing is gone ? The law has nowhere withdrawn, in form, its command of performance; but it thenceforward withholds all means of compelling such performance, and this alone destroys the legal obligation. And so essential to the legal obligation to do what the law directs is the means devised to compel the doing, that, in many instances, the direction to do is only implied in the exhibition of the means of compulsion. While it is true that whatever legislation recalls the existing law’s command of performance, or reduces the extent of its requirement, impairs the “ obligation of contracts” then existing, so far as affected by it, it is, therefore, not less true that whatever legislation makes this compulsion sensibly less effective than it was before has, to that extent, the same effect. And whether it be in contracting the compass of what it accomplishes, in diminishing the vigor, promptness and certainty with which it operates, or in multiplying the burdens, obstacles and risks with which alone it can be made available, such legislation can work its results only by acting on the means through which this compulsion is effected; in other words, on the remedy. It is the remedy provided by law for the injury inflicted, by their violation, that imparts any actual obligation, any compelling power to contracts. And just in proportion as delay, uncertainty, inadequacy or onerous exactions characterize the remedy, just in that proportion may the wrong-which it is intended to rectify be committed with legal impunity, and is the obliging power of the law, that is, in the present case, “the obligation of contracts,” actually diminished or “impaired." In reference to contracts betjveen individuals, *158 in distinction from those to which the State itself is a party, when legislation appears to act most directly and immediately upon the contract itself, as by making writing essential to its validity, by permitting its satisfaction and discharge by the payment or delivery of something less or other than that which its terms require, by extending the time during which performance may be delayed beyond the limit which itself prescribes, or otherwise, it only can effectually, and in fact always does accomplish it’s purpose through the remedy or means provided for enforcing the contract, by withholding this altogether, or retarding it, or regulating the recovery as to amount or subject-matter, or discharging the judgment upon satisfaction partial only in reference to its terms.
It has not been here said, nor is it meant, that the existing law respecting contracts and the remedies for enforcing them in all its minute details, or at all, enters into and becomes a part of every contract. The view which attributes the creation of the obligation to the contract itself alone needs the admission of that proposition, and to that view it seems essential. But where there are forty distinct States, in any one of which the recusant party to the contract, if found, may be subjected to an action for its enforcement, the inquiry may well arise, the law of which of these States became a part of this particular contract ? or were the laws of all incorporated into it? In the view here taken, “the obligation of contracts” is used in this prohibition abstractly, to express a legal entity, wholly independent of all considerations respecting the' place where a contract was made, or the domicil of the parties thereto, existing always in every State that has laws on the subject of contracts, and created and moulded by those laws, whether they concern the validity of contracts as affected by form or substance, their construction and effect, their necessary incidents, or their efficient enforcement, whether restricted in their operation to a particular contract, as in case of those to which the State is a party, or to any special class of con *159 tracts, or extended to contracts in general; and any change in this law, whatever'be the particular form and direction it may take, which makes contracts in any material degree less valuable to parties claiming performance than they would otherwise have been, “ impairs” the obligation of contracts, and is within the aim and terms of the prohibition.
Undoubtedly this constitutional restraint upon legislation was not designed to deprive the States of the essential power to mould their several general systems of judicature and courses of legal procedure, the organization of their Courts, their terms, the forms of actions, pleadings and process therein, the rules of practice, and other such matters pertaining to the administration of justice, in such manner as in their own judgments respectively, instructed by experience, will best fulfil their high duty in this behalf. And changes in the law, with a view to the attainment of this end, may incidentally affect the remedy upon existing contracts, and by delay or otherwise render it to some extent less effective. If such result is strictly and necessarily incident to the change, so that it cannot be separated therefrom and prevented consistently with the general and permanent improvement contemplated in the law, it would not render the legislation obnoxious to the prohibition. An illustration of this may be found in the Act of the last session, " To alter the sittings of the Courts of law within the Eastern Circuit,” one incident of which certainly is to delay suitors in the Common Pleas for Darlington District some four weeks in the progress of their actions, whether upon contracts or otherwise. Such changes as this have been frequently made, and always to some extent with similar incidental consequences to the interests of suitors in some one or other of the districts, and sometimes in many; yet no one has ever questioned the constitutional validity of such legislation, or imagined that it was within the intention of this prohibition. It is easily seen that the special result in these instances could not be disjoined from the general change deemed need *160 ful. An illustration, as well of the possibility of separating, from a general change intended, the incidental effect thereof upon existing contracts, and saving the obligation of such as moulded by the previous laws, as of the cotemporaneous understanding of this prohibition and the conscientious care of the législators of that day to observe it, is furnished in the proviso to the fourth section of the Act of 1791, (7 Stat. 267,) “To amend the several Acts for establishing County Courts, and for regulating and amending the proceedings therein,” &c. It may not be practicable to settle the terms of any general rule, the application of which -will uniformly distinguish which is the principal and which the incident, and whether the latter is necessary and unavoidable or not, and thus ascertain the exact boundary between legitimate and prohibited legislation. And for reasons which will readily suggest themselves to professional minds, it would perhaps not be wise to attempt this. Each single instance of legislation, supposed to be liable to condemnation, is better judged by its peculiar indicia as ranging it with the one or the other class.
This whole subject was so thoroughly discussed in the judgment pronounced by this Court in The State vs. Carew, (13 Rich. 498,) heard and determined so recently as at the May sittings of last year, as to render almost inexcusable the present exposition. It was there most abundantly demonstrated that the probable origin of the peculiar terms in which this prohibition is expressed, the mischiefs in the actual experience of which it had its rise, and which it was intended thereafter to prevent, the history of its adoption, the cotem-poraneous understanding of its design, and its uniform interpretation from the earliest period at which its meaning was brought into question, all concur in affirming that legislation affecting only the remedy upon contracts was peculiarly within its aim. In that case a law which prohibited the service or execution of process for the collection of money until after the expiration of the next succeeding session of the General *161 Assembly, and in this way arrested the progress of actions instituted under the previously-existing laws and rules of procedure to enforce the performance of contracts, and held them suspended for a period of twelve months, was “ at variance with the article of the Constitution of the United States which prohibits a State from passing any law impairing the obligation of contracts,” and “ consequently inoperative and void.” From the examination which has been- herein made of the statute now under consideration, it has been seen that it differs from the former only in this, that it arrests the action at a sopiewhat later stage of its progress, and suspends it for a shorter period of time. The former Act seized the hand of the Sheriff the Court’s executive officer, and held it back for twelve months, so as to delay for that period the service of process only in actions, the causes of which are the special objects of this constitutional protection. The latter “occludes,” shuts up and locks the Court itself, as against the same class of actions and no other, after service, for six months, thus délaying for that interval the progress of the suit. In each case the legislation, which is excepted to, seeks directly and authoritatively to diminish the promptness with which the means theretofore furnished by law for compelling the performance of contracts operated, and forcibly to subject the rights and interests of the creditor to all the perils incident to the consequent delay; it reduces the constraining power of the law by lessening the vigor of its action, and to this extent takes off the pressure upon the will of the debtor which was obliging him to the fulfilment of his promise: in its actual and direct operation it “ impairs,” enfeebles, relaxes “ the obligation,” the compulsory efficiency which the existing law had communicated to the contract, and which had been already called into action. And this effect of the legislation has not the excuse that it is merely a necessary and inseparable incident of a general and permanent change thereby wrought in the law of procedure. On the contrary, it is itself *162 the principal, nay the only change in tÉe existing law. It is not even so much as that; it is but a temporary suspension of the law.
It is the judgment of this Court that the provisions of the Act of September 21, 1866, entitled “An Act to alter and fix the times for holding the Courts of Common Pleas in this State,’’ in so far as they postpone the return of writs and other process in actions ex contractu, returnable to Fall Term, 1866, until the Spring Term, 1867, and suspend the trial of and other proceedings in such actions at the said Fall Term, and until the said Spring Term, where the causes of action were in existence at the date of the ratification of the said Act, are repugnant to the tenth section of the first article of the Constitution of the United States, and to the second section of the ninth article of the Constitution of this State, which prohibited the passage of any State law impairing’ the obligation of contracts, and are, therefore, inoperative and void; and that all proceedings in such actions ex contractu may go on as if the said Act had not been passed.
Dunkin, C. J., Glover and Munro, J. J., Lesesne and Johnson, 0. C., concurred.
Moses, J., dissented.